**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**COOPER HOSPITAL / UNIVERSITY MEDICAL CENTER,**

      **Plaintiff,**

        **v.**

**SYLVIA M. BURWELL, Secretary, U.S. Department of Health and Human Services,**

      **Defendant.**

---

**Civil Action No. 14-1991 (JEB)**

## MEMORANDUM OPINION

Will Rogers once said, "The minute you read something and you can't understand it, you can almost be sure that it was drawn up by a lawyer."  While it is unlikely he had the Medicare and Medicaid statutes in mind, there may be no legislation to which his adage better applies. The present dispute – between Cooper Hospital, a medical center located in Camden, New Jersey, and Sylvia M. Burwell, Secretary of the Department of Health and Human Services – turns on the Secretary's interpretation of a complex set of interwoven Medicare and Medicaid provisions.  Cooper seeks partial reimbursement from HHS for its fiscal year 2001 treatment of low-income patients who were ineligible for Medicaid but covered under New Jersey's charity-care statute, the New Jersey Charity Care Program (NJCCP).  HHS has denied such repayments, arguing that the provision under which Plaintiff seeks repayment, the Medicare Disproportionate Share Hospital (DSH) provision, does not permit reimbursement for Medicaid-ineligible patients.

Cooper first appealed this denial administratively and, failing there, now brings this suit. In addition to continuing to challenge the reimbursement denial, the hospital also grumbles that

1

HHS has treated it differently from hospitals in other states.  More specifically, it objects that while its charity-care patients were denied, the agency permits reimbursement for Medicaid-ineligible patients in states that participate in what is known as § 1115 expansion-waiver programs.  Plaintiff contends that these expansion-waiver patients are, in all relevant ways, identical to its NJCCP patients, insofar as both sets of patients are ineligible for traditional Medicaid.  Because NJCCP patients' Medicaid ineligibility was the basis for HHS's denial of Cooper's Medicare DSH reimbursement, the hospital believes this same reasoning should prohibit reimbursement for Medicaid-ineligible expansion-waiver patients.  It therefore argues that the Secretary's disparate treatment of these patient groups is arbitrary and capricious, thus violating both the Administrative Procedure Act and the equal-protection guarantee implied in the Due Process Clause of the Fifth Amendment to the Constitution.

After traversing its way through the labyrinthine Medicare and Medicaid statutory provisions, the Court ultimately concludes that the agency has acted rationally in interpreting these laws.  Indeed, as the Court will explain, D.C. Circuit precedent essentially forecloses any route for success in Plaintiff's suit.  Circuit precedent mandates that the Secretary – and this Court – interpret the Medicare statute so as to deny reimbursement for Cooper's NJCCP patient days.  Yet the Circuit has also held that Congress granted the Secretary express permission to include § 1115 expansion-waiver patients in Medicare DSH reimbursement.  Given these holdings, Plaintiff's claim of disparate treatment fails, as the Secretary had a clear rational basis – and express statutory permission – to differentiate between Cooper's charity-care patients and § 1115 expansion-waiver patients. The Court will, accordingly, grant Defendant's Motion for Summary Judgment.

## I.      Background

Plaintiff Cooper Hospital / University Medical Center is a 560-bed not-for-profit general-acute-care hospital and academic medical center located in Camden, New Jersey, which participates in both the federal Medicaid and Medicare programs.  See Compl., ¶¶ 1, 10; Pl. MSJ at 5.  Over a third of Cooper's patients are indigent, given the substantially low-income community that the hospital serves.  See Pl. MSJ at 5.  Defendant Sylvia M. Burwell is the Secretary of HHS, the agency responsible for operating the Medicare program.  See Compl., ¶ 12.  Cooper here challenges its Medicare DSH-reimbursement calculation for the fiscal year ending December 31, 2001.  See Pl. MSJ at 1.  Before turning to the specifics of Plaintiff's claim, the Court will lay out in detail how both the Medicare and Medicaid programs operate.  Such explanation is necessary given the complexities of the repayment determination involved here.

### A.   Medicare Reimbursement Policies

"This case is significantly more difficult to describe than to decide," Cookeville Reg'l Med. Ctr. v. Thompson, No. 04-1053, 2005 WL 3276219, at *1 (D.D.C. Oct. 28, 2005), for navigating the Medicare and Medicaid statutes' choppy waters is no easy feat.  Both are federally funded medical-insurance programs that are part of the Social Security Act, which "is among the most intricate [statutes] ever drafted by Congress.  Its Byzantine construction, as Judge Friendly has observed, makes the Act 'almost unintelligible to the uninitiated.'"  Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981) (quoting Friedman v. Berger, 547 F.2d 723, 727 n.7 (2d Cir. 1976)).  Although the two programs share similarities, each functions in partial independence of the other, albeit with many cross-references between the subchapters.

1.   *Medicare DSH Adjustment*

Medicare, established as Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et. seq.*, provides medical insurance for the elderly and disabled, and the present dispute concerns provisions within Medicare "Part A," which authorizes payments for certain inpatient hospital services and related services.  See Def. MSJ/Opp. at 2; see also 42 U.S.C. §§ 1395c–1395i-5. While the federal government reimburses hospitals for qualified costs under Medicare, the reimbursement rates are not based on hospitals' actual costs.  Instead, they are based on a Prospective Payment System (PPS), which provides "prospectively determined rates, rather than on the actual operating costs incurred by the hospital."  Def. MSJ/Opp. at 3 (citing 42 U.S.C § 1395ww(d)(1)-(4)).  HHS's calculations for reimbursement rates for individual hospitals can thus significantly affect a given hospital's bottom line.  Unsurprisingly, then, the gravamen of this suit concerns such a reimbursement calculation for Cooper Hospital.

Cooper objects to HHS's approach to calculating reimbursement rates under what is known as the Medicare Disproportionate Share Hospital (DSH) adjustment.  Recognizing that "[h]ospitals that serve disproportionate numbers of low-income patients have higher per-case medicare costs," but receive the same PPS reimbursements as other hospitals, see H.R. Rep. No. 99-241, pt. 1, at 16 (1986), Congress created the Medicare DSH adjustment, which requires HHS to increase PPS payments to hospitals that serve a "significantly disproportionate number of low income patients."  42 U.S.C. § 1395ww(d)(5)(F)(i)(I); Pl. MSJ at 1; Def. MSJ/Opp. at 3. Whether a given hospital qualifies for a Medicare DSH adjustment, and how large that adjustment is, depends on the hospital's "disproportionate patient percentage," or DPP.  See 42 U.S.C. § 1395ww(d)(5)(F)(v)).  That DPP calculation is in turn based on the sum of two fractions.  The first is referred to as the "Medicare/SSI" DPP fraction, which is not relevant here,

id. § 1395ww(d)(5)(F)(vi)(I), and the second is the Medicaid DPP fraction.  Id.

§ 1395ww(d)(5)(F)(vi)(II).  The latter is so called because it calculates reimbursement for those

who are Medicaid eligible, see Compl., ¶ 36; Def. MSJ/Opp. at 3, but whether it does in fact

permit reimbursement only for Medicaid-eligible patients is the question at the heart of this suit.

 As explained in more detail below, the controversy here concerns the proper calculation

of Cooper's Medicaid DPP fraction of the Medicare DSH calculation for fiscal year 2001.  As of

2001, the Medicaid DPP fraction was defined as follows:

> the fraction (expressed as a percentage), the numerator of which is
> the number of the hospital's patient days for such period which
> consist of patients who (for such days) were eligible for medical
> assistance under a State plan approved under subchapter XIX of this
> chapter, but who were not entitled to benefits under [Medicare] part
> A of this subchapter, and the denominator of which is the total
> number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added).  To pierce through the legalese, the

reason this fraction is known as the Medicaid fraction is because "subchapter XIX" is the

Medicaid statute, and so a "State plan approved under" it refers to a Medicaid state plan.  Id.

§§ 1396 et seq.  In plain English, then, the Medicaid DPP fraction is the percentage of all

hospital patients who are eligible for medical assistance under a Medicaid state plan but not

eligible for Medicare Part A.  Or, expressed in mathematical terms:

$$\frac{\textit{Total days treating patients eligible for medical assistance under a Medicaid state plan but not eligible for Medicare Part A}}{\textit{All patient days}}$$

Medicare DSH thus provides supplemental reimbursement for treatment of patients who were

eligible for either Medicare/SSI ("Medicare DPP") or Medicaid ( "Medicaid DPP"), as both

populations tend to have disproportionately higher medical-treatment costs.  The greater the

number of patient days included in this fraction, then, the higher the reimbursement rate for the

hospital from HHS.  Confusingly, while this dispute concerns the Medicare DSH adjustment,

because that adjustment depends in part on how the Medicaid DPP defines Medicaid eligibility,

the crux of the statutory interpretation dispute turns primarily on the Secretary's reading of the

Medicaid statute.  The Court will thus take a short detour through that legislation.

### 2.  *Medicaid DPP Fraction*

In contrast to Medicare, which is administered by HHS and provides medical insurance

on the basis of age and disability, "Medicaid is a cooperative federal-state program that provides

medical assistance to certain limited categories of low-income persons and other individuals who

face serious financial burdens in paying for needed medical care."  Def. MSJ/Opp. at 4; see

generally 42 U.S.C. §§ 1396 *et seq.*  To be eligible for Medicaid funding, states submit a medical

assistance plan (known as a "State plan") to the Secretary; each plan must meet certain

requirements related to the medical coverage of low-income patients, see 42 U.S.C. § 1396a(a),

such as the categories of individuals eligible for assistance and the kinds of medical care and

services that can be provided.  See Def. MSJ/Opp. at 4.  Once the Secretary approves a Medicaid

State plan, the state receives matching payments from the federal government in a "percentage

. . . of the total amount expended . . . as medical assistance under the State plan."  42 U.S.C.

§ 1396b(a)(1).  In 2001, then, Cooper's Medicare DSH adjustment depended in part on what

portion of its patients were considered eligible for medical assistance under New Jersey's

Medicaid State plan.

### 3.  *New Jersey Charity Care Program*

Because Plaintiff's objection is based on the Secretary's refusal to include its NJCCP

patient days as part of its Medicare DSH calculation, the basic provisions of the NJCCP are also

important to understand.  That program covers "some or all of the costs for uninsured hospital

patients who are 'ineligible for private or governmental sponsored coverage (such as Medicaid).'" Cooper Univ. Hosp. v. Sebelius, 686 F. Supp. 2d 483, 487 (D.N.J. 2009) (quoting N.J. Hospital Care Payment Assistance Fact Sheet at 1)); see also (Joint Appendix (JA) 151). While such charity-care patients are not eligible for Medicaid and Medicaid makes no direct payments to hospitals that provide them with medical services, see Def. MSJ/Opp. at 7, such patients are counted for the purposes of determining a hospital's Medicaid DSH adjustment. See 42 U.S.C. § 1396r-4(b)(1)(B). That Medicaid DSH calculation is not in dispute here, but Plaintiff erroneously pointed to it in support of its legal position during the administrative hearing. See Compl., ¶ 52; Pl. MSJ at 6, 12-13. As a reminder, the calculation that is in dispute is Cooper's Medicare DSH adjustment, and Plaintiff seeks to have its patients who are provided with medical services under the NJCCP included in the Medicaid DPP Fraction of that Medicare DSH adjustment. See Def. MSJ/Opp. at 7.

  B.  Cooper's Medicare Reimbursement Challenge

  Cooper's specific challenge here relates to the denial of its reimbursement for NJCCP patient days under the Medicare DSH adjustment. Complicating matters still further, Medicare payments to hospitals are not made directly from HHS, but are instead processed by entities that are known as fiscal intermediaries – typically, private health-insurance companies that contract with HHS. See Pl. MSJ at 3 n. 3; Def. MSJ/Opp. at 8. When Cooper submitted its Medicare DSH calculation to its intermediary for the fiscal year ending December 31, 2001, it included among total reimbursable patient days 5,559 inpatient days attributable to NJCCP patients. See Pl. MSJ at 3. The fiscal intermediary disallowed all of those patient days, reducing the hospital's annual Medicare reimbursement by $1,431,228. Id.; Provider Reimbursement Review Board Decision (Sept. 23, 2014) at 4 (JA 8). Plaintiff filed a timely appeal with the relevant

administrative agency, the Provider Reimbursement Review Board (PRRB), on January 14,

2005, challenging the fiscal intermediary's disallowance.  See Pl. MSJ at 3-4; PRRB Decision at

4 (JA 8).  For reasons unexplained by either party, but of no particular moment, nearly a decade

passed before that appeal was heard.  A hearing was ultimately held on June 19, 2014, and in a

decision dated September 23, 2014, the PRRB upheld the disallowance.  See PRRB Decision (JA

5-17).  A month later, on October 30, 2014, the Administrator for the Centers for Medicare &

Medicaid services (CMS), a sub-unit of HHS, notified Cooper that it had declined to review the

PRRB's decision.  See CMS Letter (Oct. 9, 2014) (JA 3-4).  Plaintiff then timely filed this suit

pursuant to 42 U.S.C. § 1395oo(f)(1) and has now moved for summary judgment on the

administrative record.  See Pl. MSJ at 5.  Defendant has filed a cross-motion, arguing that the

Court should sustain the Secretary's decision as rational.  See Def. MSJ/Opp. at 2.

Cooper sets out two causes of action in its Complaint.  In Count I, it claims that the

Secretary's decision to deny reimbursement must be set aside as arbitrary and capricious because

it is inconsistent with her prior and subsequent interpretations of the Medicare DSH statute.  See

Compl., ¶ 66.  Plaintiff also argues in this count that the Secretary's disparate treatment of

§ 1115 expansion-waiver hospitals (explained below) is arbitrary and capricious, insofar as she

permits those hospitals' low-income patient days to be included in Medicare DSH calculations

even where such patients are not eligible for traditional Medicaid benefits.  Id., ¶ 68.  Cooper's

Count II alleges that this same disparate treatment is also a violation of the Equal Protection

Clause of the Fourteenth Amendment.  Id., ¶¶ 77-83.  Because the only defendant in the suit is

the Secretary – serving in her capacity as the head of a federal agency – the Court will assume

that Plaintiff means to plead a violation of the equal-protection guarantee implied in the Due

Process Clause of the Fifth Amendment, which, unlike the Fourteenth Amendment, applies to the

federal government.  See Bolling v. Sharpe, 347 U.S. 497, 499-500 (1955); see also Buckley v. Valeo, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.").

## II.   Legal Standard

Both parties here have moved for summary judgment on the administrative record.  See Pl. MSJ at 5; Def. MSJ at 10.  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006); see also Bloch v. Powell, 227 F. Supp. 2d 25, 30 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d. at 90 (quotation marks and citation omitted).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted), aff'd, 408 Fed. App'x 383 (D.C. Cir. 2010).

Judicial review of the Secretary's decision in this case is governed by the Medicare statute, 42 U.S.C. § 1395oo(f)(1), which incorporates the judicial-review provisions of the APA, 5 U.S.C. § 706.  The Court, accordingly, must "hold unlawful and set aside" the Secretary's decision only if it is "unsupported by substantial evidence," or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  Under this "narrow" standard of review, "a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983).  Rather, the Court "will defer to the [agency's] interpretation of what [a statute] requires

so long as it is 'rational and supported by the record.'"  Oceana, Inc. v. Locke, 670 F.3d 1238,

1240 (D.C. Cir. 2011) (quoting C & W Fishing Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir.

1994)).

     An agency is required to "examine the relevant data and articulate a satisfactory

explanation for its action."  State Farm, 463 U.S. at 43.  For that reason, courts "'do not defer to

the agency's conclusory or unsupported suppositions,'"  United Techs. Corp. v. U.S. Dep't of

Def., 601 F.3d 557, 563 (D.C. Cir. 2010) (quoting McDonnell Douglas Corp. v. U.S. Dep't of

the Air Force, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and "agency 'litigating positions' are not

entitled to deference when they are merely [agency] counsel's 'post hoc rationalizations' for

agency action, advanced for the first time in the reviewing court."  Martin v. Occupational Safety

& Health Review Comm'n, 499 U.S. 144, 156 (1991).  The reviewing court thus "may not

supply a reasoned basis for the agency's action that the agency itself has not given."  Bowman

Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (citation

omitted).  A decision that is not fully explained may, nevertheless, be upheld "if the agency's

path may reasonably be discerned."  Id. at 286.  "The requirement that agency action not be

arbitrary or capricious [also] includes a requirement that the agency . . . respond to 'relevant' and

'significant' public comments," a requirement that is not "particularly demanding."  Pub.

Citizen, Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993) (citations omitted).

     Here, Cooper contests the Secretary's interpretation of the Medicare statute.  When

reviewing an agency's interpretation of a law it administers, the Court must apply the principles

of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984); Se.

Ala. Med. Ctr. v. Sebelius, 572 F.3d 912, 916 (D.C. Cir. 2009).  Under Chevron, the first step is

to "examine the statute *de novo,* 'employing traditional tools of statutory construction.'"

National Ass'n of Clean Air Agencies v. EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (quoting

Chevron, 467 U.S. at 843 n.9); see also Mount Royal Joint Venture v. Kempthorne, 477 F.3d

745, 754 (D.C. Cir. 2007) (court begins by "applying customary rules of statutory

interpretation").  "If the intent of Congress is clear, that is the end of the matter; for the court, as

well as the agency, must give effect to the unambiguously expressed intent of Congress."

Chevron, 467 U.S. at 842–43; see also Eagle Broadcasting Group, Ltd. v. FCC, 563 F.3d 543,

552 (D.C. Cir. 2009) (if the "search for the plain meaning of the statute . . . yields a clear result,

then Congress has expressed its intention as to the question, and deference is not appropriate")

(internal citation and quotations omitted); Arkansas Dairy Co-op Ass'n, Inc. v. U.S. Dep't of

Agr., 573 F.3d 815, 829 (D.C. Cir. 2009) (no deference due where agency's construction is

"contrary to clear congressional intent").

        If, however, "the statute is silent or ambiguous with respect to the specific issue,"

Chevron, 467 U.S. at 843, the analysis proceeds to "determine the deference, if any, [the court]

owe[s] the agency's interpretation of the statute."  Mount Royal Joint Venture, 477 F.3d at 754.

Under this step, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express

delegation of authority to the agency to elucidate a specific provision of the statute by regulation.

Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or

manifestly contrary to the statute."  Chevron, 467 U.S. at 843-44.  Where a "legislative

delegation to an agency on a particular question is implicit rather than explicit," id. at 844, the

Court must uphold any "'reasonable interpretation made by the administrator' of that agency."

Am. Paper Inst., Inc. v. EPA, 996 F.2d 346, 356 (D.C. Cir. 1993) (quoting Chevron, 467 U.S. at

844).  In the case of the Medicare and Medicaid statutes in particular, "[t]he identification and

classification of medical eligibility criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.  In those circumstances, courts appropriately defer to the agency entrusted by Congress to make such policy determinations."  Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991).

## III.    Analysis

Because both sides have moved for summary judgment on the administrative record, the Court begins with Cooper's appeal to the PRRB following the intermediary's denial of its submission for reimbursement.  After summarizing the PRRB's ruling, the Court considers that decision in light of D.C. Circuit precedent regarding interpretation of the Medicare statute. Because the Circuit's interpretation of the Medicare DSH provision – which is consistent with the Secretary's position – controls here, the Court finds that HHS appropriately denied Plaintiff's reimbursement claim.  The Court then turns to Plaintiff's second argument – namely, that the Secretary's disparate treatment of § 1115 expansion-waiver hospitals, which she treats as eligible for Medicare DSH reimbursement, is arbitrary and capricious and in violation of both the APA and the equal-protection guarantee.  Here again, the D.C. Circuit has interpreted the Medicare DSH statute as having long granted the Secretary the discretion to include § 1115 expansion-waiver patient days in the Medicaid DPP fraction.  The only outstanding question for the Court is therefore whether the agency provided a rational basis to exercise this discretion and include these patient days in that fraction. Given this circuit's prior holdings, the Court concludes that it clearly has.

### A.  PRRB Decision

As a reminder, Cooper's challenge relates to the interpretation of the Medicaid DPP fraction of the Medicare statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), and specifically the

meaning of the phrase "patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid] . . . ." PRRB Decision at 2-3 (JA 6-7).  Cooper's primary strategy before the PRRB was to emphasize the ways in which the NJCCP coordinates with HHS and conforms to the Medicaid statutes.  The hospital argued that the enabling State plan authorizing NJCCP medical assistance in New Jersey <u>was</u> approved under Medicaid, satisfying the Medicaid DPP definition.  <u>See</u> PRRB Decision at 5 (JA 9).  In aid of this assertion, Plaintiff pointed to one part of the New Jersey state plan that permitted <u>Medicaid</u> DSH reimbursement to include "actual documented charity care" – *i.e.*, treatment covered by the NJCCP.  <u>Id.</u>  The hospital thus contended that "the enabling State Plan authorizing medical assistance in New Jersey [the NJCCP] was approved under [Medicaid] . . . and contains provisions for payments to hospitals under the subject NJCCP as one form of federally matched medical assistance."  <u>Id.</u>  On this basis, Cooper concluded that since "persons eligible under the NJCCP receive 'medical assistance' as part of New Jersey's 'State Plan approved under [Medicaid],' NJCCP days must be included in the Medicare DSH calculation." <u>Id.</u>

Whether this construction of the statute is correct turns on the meaning of two related terms: "a State plan approved under [Medicaid]" and "medical assistance."  In the PRRB hearing, the intermediary countered that while the NJCCP is <u>referenced</u> in the New Jersey Medicaid state plan for purposes of the Medicaid DSH adjustment, NJCCP-eligible patients are not themselves patients eligible for the traditional Medicaid program under the state plan, and are therefore not provided "medical assistance" as defined in the Medicaid statute.  <u>Id.</u> at 7 (JA 11). The intermediary pointed to the Secretary's regulation implementing the Medicare DSH statute, which instructed that computation of the Medicaid DPP fraction was to be "the number of the

hospital's patient days of service for which patients were <u>eligible for Medicaid</u> but not entitled to

Medicare Part A . . . ." <u>Id.</u> (quoting 42 C.F.R. § 412.106(b)(4)).  The intermediary further

pointed to Program Memorandum PM A-99-62, which represented CMS's official position on

the issue and which also stated that for a Medicaid DPP patient day to count under the Medicare

DSH adjustment, the patient had to be eligible for medical assistance under Medicaid.  <u>Id.</u> at 8

(JA 12).

  The PRRB sided with the intermediary.  It noted that the NJCCP was only included in the

New Jersey Medicaid state plan for the purposes of calculating <u>Medicaid</u> DSH payments, and so

this did not make it a qualifying "State plan approved under Medicaid" for the purposes of the

<u>Medicare</u> DSH adjustment.  <u>Id.</u> at 9 (JA 13).  In making this determination, the PRRB noted the

critical difference between the language of the Medicare DSH calculation defined at 42 U.S.C.

§ 1395ww(d)(5)(F)(vi)(II) and the Medicaid DSH calculation defined at 42 U.S.C. § 1396r-

4(c)(3)(B).  Like the Medicare DSH provision, the Medicaid DSH provision includes

reimbursement for "patient services under a State plan," but it also provides for "patient services

received directly from State and local governments" and "inpatient hospital services which are

attributable to charity care . . . ." <u>Id.</u> at 10 (JA 14) (citing 42 U.S.C. § 1396r-4(b)(3)).  Implicitly

invoking the rule against superfluities, the PRRB accordingly determined that "[i]f Congress had

intended the term 'eligible for medical assistance under a State plan' . . . to include the state-

funded hospital days and charity care days, the subsections adding those types of days . . . would

have been superfluous" in the Medicaid DSH definition.  <u>Id.</u> at 10-11 (JA 14-15).  The reason

NJCCP charity-care days are included in the Medicaid DSH calculation, rather, is because the

NJCCP is charity care funded by state and local governments, but such patients cannot be

considered "eligible for medical assistance under a [Medicaid] State plan . . . ." <u>Id.</u> at 11 (JA 15)

(quoting 42 U.S.C. § 1396r-4(b)(2)).  On this basis, the PRRB concluded that the identical phrase

in the Medicare DSH statute does not permit inclusion of NJCCP patient days, and it upheld the

intermediary's adjustment excluding those days from the Medicare DSH calculation for fiscal

year 2001.  Id.

 Although it recognized that in its prior decisions the PRRB had interpreted the Medicare

DSH provision to include patient days counted under "any program identified in the approved

state plan," id. at 9 (JA 13) (emphasis added), the board pointed to a recent D.C. Circuit decision,

Adena Reg'l Med. Ctr. v. Leavitt, 527 F.3d 176 (D.C. Cir. 2008), which held that Medicaid-

ineligible patient days should not be included in the Medicaid DPP fraction of the Medicare DSH

calculation.  Id.  More on Adena in a moment.

 The PRRB also noted one additional supplementary argument: Cooper filed in its appeal

a request to reopen the record and present a new legal theory in light of a recently decided

district-court case, Nazareth Hospital v. Sebelius, 938 F. Supp. 2d 521 (E.D. Pa. 2013).  On the

basis of that decision, Plaintiff argued before the PRRB that the Secretary had violated the Equal

Protection Clause by permitting hospitals whose patients days did not qualify for Medicaid

nevertheless to count these days in their Medicare DSH calculations if those hospitals were in

§ 1115 expansion-waiver states.  See PRRB Decision at 11 (JA 15).  The PRRB declined to

address the issue because it found it lacked the legal authority to resolve claims asserting alleged

constitutional violations.  Id. at 12 (JA 16).  The Court will describe this disparate-treatment

argument in greater detail below, as it is ripe for decision here.

 Plaintiff now appeals the PRRB's decision, arguing both that it incorrectly affirmed the

intermediary's exclusion of Cooper's NJCCP patient days from its Medicare DSH-

reimbursement calculation, and that the Secretary's decision to refuse NJCCP patient days while

including § 1115 expansion-waiver patient days was arbitrary and capricious in violation of both

the APA and the equal-protection guarantee.  The Court tackles each of these challenges in turn.

      B.  <u>Secretary's Interpretation of Medicare DSH Provision</u>

As to the first question, Plaintiff's theory runs up against an immediate and

insurmountable obstacle: the D.C. Circuit has already affirmed the Secretary's interpretation of

the Medicare DSH statute, and that interpretation is binding precedent on this Court.  In <u>Adena</u>,

the Court of Appeals was confronted with a similar challenge by an Ohio hospital whose

Medicare DSH-reimbursement calculation for charity-care patient days had also been denied.

The state charity-care program in question in <u>Adena</u> – the Ohio Hospital Care Assurance

Program (HCAP) – like NJCCP, provided "basic, medically necessary hospital-level services at

no charge" for "indigent Ohioans who are not recipients of . . . the Ohio Medicaid plan . . . ."

527 F.3d at 177 (internal citations and quotation marks omitted).  As here, patient days treated

under HCAP were denied for Medicare DSH reimbursement by the intermediary, and the

plaintiff sued the Secretary, challenging the determination that HCAP patients were not "eligible

for medical assistance under a State plan approved under [Medicaid]."  <u>Id.</u> at 178.  The D.C.

Circuit upheld the Secretary's determination, resting its decision on the meaning of the phrases

"eligible for medical assistance" and "under a State plan approved under [Medicaid]."  Both

reasons have equal applicability here.

First, the Circuit determined that HCAP was not "a State plan approved under

[Medicaid]."  This was because treatment of Ohio's HCAP patients was not part of the Ohio

State Medicaid Plan; while "an approved State Medicaid plan . . . must pay providers for the care

of eligible patients," HCAP required "the Hospitals to care for indigent patients without

payment."  <u>Id.</u>  HCAP further required hospitals to care for patients only if they were <u>not</u>

recipients of Medicaid.  Id.  Wise to the weakness of their position on this issue, the Ohio

hospitals, like Cooper here, contended that the Secretary had approved certain aspects of HCAP

as an amendment to Ohio's Medicaid plan, suggesting that HCAP itself must therefore be part of

a "State approved plan under Medicaid."  Id. at 179.  The Circuit saw right through this gambit:

that amendment only related to reimbursement under the Medicaid DSH provision, for which

HCAP was eligible only once the Secretary had approved it.  Id.  While HCAP was approved in

conjunction with Ohio's Medicaid state plan, it was only for the limited purpose of inclusion

under the Medicaid DSH provision, as HCAP itself was not part of the state's Medicaid plan.  Id.

Second, the Circuit concluded that HCAP patients were not those "eligible for medical

assistance" under a Medicaid state plan as defined by the Medicaid statute.  It noted that the

phrase in question in the Medicare DSH provision – "medical assistance under a State plan

approved under [Medicaid]," 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) – appears throughout the

Medicaid statute, in which it is defined as "'payment of part or all of the cost' of medical 'care

and services' for a defined set of individuals . . . whereas the HCAP does not entail any

payment."  Id. at 180 (quoting 42 U.S.C. § 1396d(a)).  Following the Supreme Court's whole-act

invocation that "identical words used in different parts of the same act are intended to have the

same meaning," the court concluded that medical treatment under HCAP indisputably did not

qualify as medical assistance under the Medicaid statute, and thus would not under the Medicare

DSH provision either.  Id. (quoting Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427,

433 (1932)).  Like the PRRB – as discussed above – the Adena court pointed to the contrasting

language in the Medicare and Medicaid DSH provisions.  Whereas the Medicaid DSH provision

expressly permits payments for "services provided to patients eligible for medical assistance

under a State plan approved under [Medicaid] or to low-income patients," 42 U.S.C. § 1396r-

4(c)(3)(B) (emphasis added), the Medicare DSH provision includes no such low-income patient clause.  See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  The court thus concluded that the reason the Medicaid DSH calculation included HCAP charity-care patients was because those patients were "low-income patients" – not because they were "patients eligible for medical assistance under a State plan approved under [Medicaid]."  527 F.3d at 180.  In contrast, Medicaid-ineligible "low-income patients" – e.g., HCAP patients – were expressly omitted from the Medicare DSH provision.  The court noted that Congress could easily have written the Medicare DSH provision to mirror the Medicaid DSH provision had it intended for those low-income patients to be included.  Id.

Because Adena controls in interpreting the Medicare DSH provision as excluding charity-care patients ineligible for Medicaid, this Court has no power to find otherwise.  The only remaining question, then, is whether NJCCP patients are "patients eligible for medical assistance under" the New Jersey State plan approved under Medicaid.  Plaintiff appears to have all but abandoned the argument that such patients are, as it stakes no such claim in its Motion for Summary Judgment.  And for good reason: as the PRRB found, "charity care beneficiaries of the NJCCP are not eligible for Medicaid" because "the services provided under the NJCCP are not matched with federal funds . . . ."  PRRB Decision at 9 (JA 13).  Indeed, NJCCP "is a safety net program for people who are uninsured, not eligible for other medical assistance programs, including New Jersey Medicaid, and who have no access to health insurance coverage."  Id. at 8 (JA 12); see also Pl. MSJ at 12 ("If an applicant is eligible for [Medicaid] medical assistance, he or she is no longer eligible for charity care.") (citation and internal quotation marks omitted).  Given the Circuit's controlling interpretation of the Medicare DSH provision in Adena, then, the

Court finds that the Secretary correctly excluded NJCCP patient days from Cooper's Medicare

DSH reimbursement calculation for fiscal year 2001.

C.  Disparate Treatment

Given that Adena has foreclosed in this Circuit any direct route of recovery for Cooper,

Plaintiff now redirects the focus of its argument from the one it made before the PRRB.   The

hospital's chief complaint here is that the Secretary's disallowance is

> arbitrary and capricious in light of the Secretary's disparate
> treatment of hospitals located in § 1115 waiver states, where low
> income days regarded as being funded under an approved State Plan
> may be included in the Medicare DSH calculation even if the low-
> income patient is not eligible for traditional Medicaid benefits.

Compl., ¶ 68.  In other words, even if the Secretary's exclusion of NJCCP patient days was

undeniably permissible on its own, her decision to reimburse Medicaid-ineligible patient days

under § 1115 expansion waivers makes such exclusion arbitrary and capricious, as well as

unconstitutional.  Cooper thus seeks a declaration invalidating the exclusion and asks that its

NJCCP patient days be included in its Medicare DSH-reimbursement calculation.  See Compl. at

23-24.

Having frequently previewed the issue as a coming attraction, the Court finally turns to

§ 1115's demonstration projects and expansion waivers.  Section 1115 of the Social Security Act

authorizes HHS to circumvent certain requirements of the Medicaid statute for experimental

"demonstration" projects that test innovative care strategies that may enhance the goals of

Medicaid.  See Pl. MSJ at 20-21 (citing 42 U.S.C. § 1315); Def. MSJ at 7.  The Secretary can

approve a state's proposed demonstration project if, "in the judgment of the Secretary," it is

"likely to assist in promoting [Medicaid's] objectives."  42 U.S.C. § 1315(a).  Under the statute,

project costs (including patient treatment costs) are "regarded as expenditures under the state

[Medicaid] plan," meaning that they are treated as reimbursable under Medicaid regardless of whether the underlying patients are Medicaid eligible.  See Def. MSJ at 7; 42 U.S.C. § 1315(a)(2)(A)).  The Secretary may grant approval only if the proposed program is estimated to be budget neutral and will not result in more federal Medicaid spending than would occur without the project.  See Def. MSJ at 7 (citing 42 U.S.C. § 1315(e)(6); 59 Fed. Reg. 49,249, 49,250 (Sept. 27, 1994)).  During the period of time relevant to this suit, the Secretary had not approved any § 1115 demonstration projects in New Jersey.  See Compl., ¶ 44; Answer, ¶ 48.

A subset of these demonstration projects is known as "expansion waivers."  While many patients treated under § 1115 demonstration projects are already Medicaid eligible (and those patient days would thus already be included in the Medicare DSH calculation), some § 1115 projects are known as "expansion waivers," for they also "provide medical assistance to expanded eligibility populations that could not otherwise be made eligible for Medicaid." Medicare Program; Medicare Inpatient Disproportionate Share Hospital (DSH) Adjustment Calculation: Change in the Treatment of Certain Medicaid Patient Days in States With 1115 Expansion Waivers, 65 Fed. Reg. 3,136, 3,136 (Jan. 20, 2000).  Section 1115 expansion-waiver patients, then, are by definition otherwise ineligible for Medicaid.  Prior to 2000, HHS's regulation concerning Medicare DSH reimbursement was silent as to whether hospitals could include § 1115 expansion-waiver patient days in their DSH calculations, but the Secretary's practice had been to exclude those days from reimbursement.  See Pl. MSJ at 21 (citing Baptist Mem. Hospital v. Sebelius, 765 F. Supp. 2d 20 (D.D.C. 2011); 65 Fed. Reg. at 3,137.  On January 20, 2000, HHS published an interim final rule providing that expansion-waiver patient days could thereafter be counted in the Medicare DSH calculation despite the fact that they would otherwise be ineligible for Medicaid.  See 65 Fed. Reg. at 3,136-37.  This position was

eventually codified at 42 C.F.R. § 412.106(b)(4)(ii).  It was this disparate treatment – including

expansion-waiver patient days in the Medicaid DPP fraction of the Medicare DSH calculation

while denying the inclusion of similarly situated NJCCP patient days – that Cooper here argues

is both arbitrary and capricious and unconstitutional.

The Court now evaluates those challenges.  Because Plaintiff's equal-protection and APA

claims fall under slightly different analytic frameworks, the Court will address each in turn.

### 1.  *Equal-Protection Challenge*

As to the equal-protection claim, the Court begins with the level of scrutiny applicable to

HHS's actions, concluding that rational basis is appropriate.  How exacting that rational-basis

analysis should be, however, depends on whether the disparate treatment is the result of the

statutory scheme as set out by <u>Congress</u> in § 1115 and the Medicare DSH provision, or solely the

result of <u>HHS's</u> rulemaking actions.  The Court thus next considers that question.  Because D.C.

Circuit precedent answers that the distinction is one drawn by the statutes, the Court finishes by

explaining why HHS has provided more than sufficient evidence to demonstrate a legitimate

governmental interest in its differential treatment of patient days.

### a.  Level of Scrutiny

Whereas an APA challenge is generally considered under the familiar rational-basis

analysis, stricter scrutiny applies when an allegedly <u>unconstitutional</u> classification proceeds

along suspect lines or infringes on a fundamental constitutional right.  <u>See</u> <u>FCC v. Beach</u>

<u>Communications, Inc.</u>, 508 U.S. 307, 313-14 (1993); <u>see also</u> <u>Am. Bus Ass'n v. Rogoff,</u> 649

F.3d 734, 738 (D.C. Cir. 2011).  The Court thus first examines whether some form of heightened

scrutiny is appropriate here.  Plaintiff does not contend that NJCCP patients represent a suspect

class, but it does put forward the novel argument that the Secretary's line-drawing exercise

infringes on a fundamental constitutional right – the right to health.  Cooper's theory is that

"there is essentially a right to health care" as a result of "the enactment of the Affordable Care

Act and the Supreme Court decisions upholding its constitutionality and the validity of the

subsidies . . . ."  Pl. MSJ at 24 (citing NFIB v. Sebelius, 132 S. Ct. 2566 (2012), and King v.

Burwell, 135 S. Ct. 2480 (2015)); see also Pl. Reply at 10.

      As Defendant correctly counters, however, "Plaintiff has not cited one case deeming the

right to healthcare as fundamental," and this case does not involve the deprivation of a benefit to

an individual necessary for the maintenance of life, an instance in which closer constitutional

scrutiny sometimes applies.  See Def. MSJ at 15-16.  Even there, application of heightened

scrutiny in the equal-protection context is limited.  See Dandridge v. Williams, 397 U.S. 471,

485 (1970) ("In the area of economics and social welfare, a State does not violate the Equal

Protection Clause merely because the classifications made by its laws are imperfect.  If the

classification has some 'reasonable basis,' it does not offend the Constitution.").  This case falls

short of even that description.  It concerns reimbursement for hospital costs under the Medicare

statute, a far cry from the deprivation to individuals of benefits necessary for life.  Other courts

faced with the exact same question, furthermore, have applied "rational basis" review, as this

Court will here.  See, e.g., Nazareth Hosp. v. Sec'y U.S. Dept. of Health & Human Services, 747

F.3d 172, 180 (3d Cir. 2014); Owensboro Health, Inc. v. Burwell, No. 14-23, 2015 WL 5437131,

at *6 (W.D. Ky. Sept. 15, 2015); Verdant Health Comm'n v. Burwell, No. 14-5108, 2015 WL

5124031, at *7 (W.D. Wash. Sept. 1, 2015).

      b.  Regulatory or Statutory Classification

      Having ascertained the general level of scrutiny, the Court now turns to the question of

whether the challenged classification is regulatory or statutory.  This matters because it affects

how the Court conducts its review.  As to the former, rational-basis "[r]eview of an equal

protection claim in the context of agency action is similar to that under the APA."  <u>Nazareth</u>, 747

F.3d at 180.  In such a case, the equal-protection argument is "folded into the APA argument,

since no suspect class is involved and the only question is whether the . . . treatment of [Plaintiff]

was rational (i.e., not arbitrary and capricious)."  <u>Ursack, Inc. v. Sierra Interagency Black Bear

Grp.</u>, 639 F.3d 949, 955 (9th Cir. 2011).  In other words, if the challenge is to an <u>agency</u> action,

the equal-protection challenge is subsumed within the APA challenge.

　　　　When the disparate treatment is the result of <u>congressional</u> action, however, both the

burden and the permissible kinds of argument shift in favor of the government.  For instance, in

such a challenge, "the plaintiff must show that the government has treated it differently from a

similarly situated party and that the government's explanation for the differing treatment does

not" suffice.  <u>Muwekma Ohlone Tribe v. Salazar</u>, 708 F.3d 209, 215 (D.C. Cir. 2013) (citation

and internal quotation marks omitted).  To this, the Supreme Court has cautioned that an

> equal protection [claim] is not a license for courts to judge the
> wisdom, fairness, or logic of legislative choices. In areas of social
> and economic policy, a statutory classification that neither proceeds
> along suspect lines nor infringes fundamental constitutional rights
> must be upheld against equal protection challenge if there is any
> reasonably conceivable state of facts that could provide a rational
> basis for the classification.  Where there are "plausible reasons" for
> Congress' action, "our inquiry is at an end."

<u>Beach Communications, Inc.</u>, 508 U.S. at 313-14 (citations omitted).  On this form of rational-

basis review, "a classification in a statute . . . bear[s] a strong presumption of validity, and those

attacking the rationality of the legislative classification have the burden 'to negative every

conceivable basis which might support it.'"  <u>Id.</u> at 314-15 (quoting <u>Lehnhausen v. Lake Shore

Auto Parts Co.</u>, 410 U.S. 356, 364 (1973)) (citation omitted).

Such statutory rational-basis analysis also bears on how the Court weighs the kinds of arguments made by the agency defending the classification.  While the parties both moved for summary judgment on the administrative record – appropriate in a typical APA challenge – "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature" or the agency.  Id. at 315.  This means that the absence of legislative facts explaining the distinction "on the record" is of no significance in rational-basis analysis of a statutory classification.  Id. (citation and quotation marks omitted).  If the Court determines that the disparate treatment of § 1115 expansion-waiver patient days and NJCCP charity-care patient days is a result of a statutory classification rather than a regulatory one, then, the agency need only provide "some legitimate governmental purpose" to survive the equal-protection challenge.  See Heller v. Doe, 509 U.S. 312, 320 (1993)).

The Court now addresses that question.  Section 1115 itself instructs that "costs of [§ 1115 waiver projects] which would not otherwise be included as expenditures under [Medicaid] . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under [Medicaid] . . . ."  42 U.S.C § 1315(a)(2)(A) (emphasis added).  Cooper correctly notes that, on its face, "there is nothing in Section 1115 stating [that] a patient group otherwise ineligible for Medicaid, but that receives health care under the demonstration project, is to be treated as a Medicaid eligible group."  Pl. MSJ at 27 (emphasis added).  Section 1115 "merely allows the treatment of demonstration project costs as expenditures under the state plan."  Id. (emphasis added).  In essence, Cooper argues that HHS improperly conflated "expenditures under the State plan," 42 U.S.C. § 1315(a)(2)(A), with "eligible for medical assistance under a State plan."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  While the Secretary may have discretion to treat expansion-waiver

patient costs <u>as Medicaid costs</u> under § 1115, Plaintiff argues that this does not enable her to treat

these patients <u>as Medicaid eligible</u> for the purposes of the Medicare DSH calculation under

1395ww(d)(5)(F)(vi)(II).  While Cooper does not articulate its position in these terms, the thrust

of its argument is that this classification is one made by the agency, not by Congress, because it

was the Secretary's 2000 interim rule that first interpreted the statute as permitting the

reimbursement of § 1115 expansion-waiver patient days in the Medicare DSH calculation.

To the hospital's detriment, D.C. Circuit precedent once again cuts against its position, as

that court has already determined that the classification is better understood as one made by

Congress.  In <u>Cookeville Reg'l Med. Ctr. v. Leavitt</u>, 531 F.3d 844 (D.C. Cir. 2008), a number of

Tennessee § 1115 expansion-waiver hospitals challenged the Secretary's decision to exclude

their expansion-waiver patient days for fiscal years prior to 2000 from their Medicare DSH

calculation.  <u>Id.</u> at 846; <u>see also</u> <u>Cookeville</u>, 2005 WL 3276219, at *3.  To determine whether

Congress had given the Secretary such discretion, the Circuit pointed to the legislature's

subsequent actions with regard to the Medicare DSH provision.  In 2005, Congress amended the

Medicaid DPP provision of the Medicare DSH, so that it now states:

> In determining under subclause (II) the number of the hospital's
> patient days for such period which consist of patients who (for such
> days) were eligible for medical assistance under a State plan
> approved under subchapter XIX of this chapter, the Secretary may,
> to the extent and for the period the Secretary determines appropriate,
> include patient days of <u>patients not so eligible but who are regarded
> as such because they receive benefits under a demonstration project
> approved under subchapter XI of this chapter.</u>

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002(a), 120 Stat. 4, 31 (codified as

amended at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).  Congress's express ratification of the

Secretary's interpretation means that, from 2005 forward, it has indisputably given her discretion

to include (or exclude) § 1115-waiver patient days in the Medicaid DPP calculation for Medicare

DSH reimbursement.  For any challenge concerning a fiscal year after 2005, the classification in question is clearly statutory.

The lingering question in <u>Cookeville</u> – as here – was what effect Congress's amendment had on the Secretary's <u>pre-2005</u> interpretations of §§ 1115 and 1395ww(d)(5)(F)(vi)(II) as permitting the inclusion of expansion-waiver patient days in the Medicare DSH calculation.  The D.C. Circuit's answer was that "[t]he Deficit Reduction Act did not retroactively alter settled law; it simply clarified an ambiguity in the existing legislation."  531 F.3d at 849.  This is because, under the doctrine of legislative reenactment, "[w]hen a Congress that re-enacts a statute voices its approval of an administrative or other interpretation thereof, Congress is treated as having adopted that interpretation, and this Court is bound thereby."  <u>United States v. Bd. of Com'rs of Sheffield, Ala.</u>, 435 U.S. 110, 134 (1978).  The doctrine unquestionably applies where "Congress indicates not only an awareness of the administrative view, but also takes an affirmative step to ratify it."  <u>Isaacs v. Bowen</u>, 865 F.2d 468, 473 (2d Cir. 1989); <u>see also</u> <u>Ass'n of Am. Railroads v. ICC</u>, 564 F.2d 486, 493 (D.C. Cir. 1977).

That is precisely what happened here, as the <u>Cookeville</u> court observed, affirming the district court's determination that "Congress ratified the Secretary's earlier policies . . . to emphasize that the Secretary always had this discretionary authority."  <u>Cookeville</u>, 531 F.3d at 849 (D.C. Cir. 2008).  Congress took this affirmative step to make clear that the Secretary could include § 1115 expansion-waiver patients days in the Medicaid DPP fraction of the Medicare DSH calculation.  Congress even went so far as to adopt the Secretary's position wholesale, codifying it directly into § 1395ww(d)(5)(F)(vi)(II) and declaring that the Secretary's 2000 and 2003 "regulations . . . are hereby ratified, effective as of the date of their respective promulgations."  DRA § 5002, 120 Stat. at 31; <u>see also</u> <u>Cookeville Reg'l Med. Ctr. v. Leavitt</u>,

No. 04-1053, 2006 WL 2787831, at *7 (D.D.C. Sept. 26, 2006).  The Circuit court thus

concluded that "Congress ratified the Secretary's earlier policies . . . to emphasize that the

Secretary <u>always</u> had this discretionary authority" to decide whether to include expansion-waiver

patient days in the Medicaid DPP calculation.  <u>Cookeville</u>, 531 F.3d at 849 (citing DRA

§ 5002(b)(3)(A)) (emphasis added).  While in <u>Cookeville</u> this shook out to mean that Congress

had granted the Secretary discretion to <u>exclude</u> expansion-waiver patient days from Medicare

DSH reimbursement, it also means that Congress statutorily affirmed the Secretary's discretion

to <u>include</u> them.

     Given <u>Adena</u> – which held that charity-care patient days must be excluded from

Medicare DSH reimbursement – and <u>Cookeville</u> –  which held that Congress granted the

Secretary discretion to include or exclude expansion-waiver patient days from such

reimbursement – the disparate treatment of § 1115 expansion-waiver patient days and charity-

care patient days is therefore a <u>statutory</u> classification, the result of Congress's policy choices

concerning the appropriate treatment of each group.  The net effect of these holdings, then, is

that as to Plaintiff's equal-protection challenge, HHS need put forward only "some legitimate

governmental purpose" to prevail.  <u>See</u> <u>Heller</u>, 509 U.S. at 320.  Of equal import, "it is entirely

irrelevant for constitutional purposes whether the conceived reason for the challenged distinction

actually motivated the legislature."  <u>Beach Communications</u>, 508 U.S. at 315.

     c.  Legitimate Governmental Purpose

     From the standpoint of Cooper's constitutional claim, the Court finds that the agency has

easily provided "some legitimate governmental purpose."  <u>Heller</u>, 509 U.S. at 320.  To repeat,

Plaintiff's argument is that the disparate treatment between its NJCCP patient days and § 1115

expansion-waiver patient days is unlawful because "NJCCP patients are financially, and

otherwise substantially equivalent to patients residing in § 1115 states and/or regions whose

hospitals' days are permitted to be included in the Medicare DSH calculation . . . ."  Compl.,

¶ 69.  Cooper contends that there is simply "no rational basis for the Secretary's internally

inconsistent application of the same statute . . . ."  Id., ¶ 82.

On the contrary, the Court identifies a number of rational reasons for the disparate

treatment, including that expansion waivers further the goals of Medicaid, that HHS has

considerably more oversight of § 1115 expansion-waiver programs than it does over state

charity-care programs, and that the decision to approve expansion-waiver programs and include

them in the Medicare DSH reimbursement is made on a case-by-case basis.  To begin, as HHS

explains, the two programs have different purposes.  Unlike charity-care plans such as the

NJCCP, § 1115 demonstration projects require a predetermination that "in the judgment of the

Secretary," such projects are "likely to assist in promoting the objectives of" Medicaid.  See 42

U.S.C § 1315(a) (emphasis added).  As the Third Circuit – confronting an almost-identical

challenge – observed,

> The purpose of these [Section 1115] demonstrations, which give
> States additional flexibility to design and improve their programs, is
> to demonstrate and evaluate policy approaches such as: expanding
> eligibility to individuals who are not otherwise Medicaid or CHIP
> eligible; providing services not typically covered by Medicaid;
> using innovative service delivery systems that improve care,
> increase efficiency, and reduce costs.

Nazareth, 747 F.3d at 181.  These are all admirable goals, and ones that Congress expressly

empowered the Secretary to promote and support.

Plaintiff counters that focusing on the Secretary's procedural oversight "conflates the

process of review [under Medicaid] with the objectives of the review."  Pl. MSJ at 33.  It argues

that Medicaid's objective is to "provide medical treatment for low-income people," something it

states NJCCP also strives to achieve.  Id. (quoting Elizabeth Blackwell Health Ctr. for Women v.

Knoll, 61 F.3d 170, 172 (3d Cir. 1995)); see also Pl. Reply at 13-14.  Yet Cooper fails in its

attempt to paper over the fact that the Medicaid statute establishes requirements for both process

of review and objectives of review.  While it is true that the Medicaid statute is aimed at treating

low-income patients, it is funded by the federal government, and HHS pre-approval is required

for all aspects of state reimbursement for qualified Medicaid expenses, including for § 1115

demonstration-project waivers.  Under § 1115 demonstration projects, the Secretary "may

determine which Medicaid requirements will be waived, how long the waiver will last, and

whether the costs of the project will be considered Medicaid expenses eligible for matching

payments under the statute."  Def. Opp. at 18 (citing 42 U.S.C. § 1315(a)(1)-(a)(2) and Pharm.

Research & Mfs. of Am. v. Thompson, 313 F.3d 600, 602 (D.C. Cir. 2002)).  Such federal

oversight and participation is part and parcel of Medicaid reimbursement, something lacking

with NJCCP charity care, which "requires no federal judgment that it is likely to assist in

promoting the goals of Medicaid."  Nazareth, 747 F.3d at 182.

Cooper rejoins that "the Secretary has significant administrative control regarding the

approval and continuation of a state plan" like the NJCCP, pointing to annual reporting

requirements baked into the Medicaid DSH-reimbursement process.  See Pl. MSJ at 34 (citing 42

U.S.C. § 1396r-4(a)(2)(D)).  This attempted bait and switch is in vain: this provision relates to

the Medicaid DSH-reimbursement process, which HHS does not dispute permits reimbursement

for charity-care patients treated under the NJCCP.  See Def. Opp. at 18 ("The NJCCP is only

referenced in the State plan because the Medicaid DSH statute requires states to submit

amendments that specify the methodologies used to identify eligible Medicaid DSH hospitals . . .

and the Secretary only reviews such amendments for compliance with requirements pertaining to

29

Medicaid DSH payments.") (citing 42 U.S.C. § 1396r-4(a)) (emphasis added).  The sole purpose

of that approval process is to determine how states with charity-care programs intend to

distribute their Medicaid DSH payments, not to further the goals of Medicaid itself.  See

Nazareth, 747 F.3d at 182.  In contrast – and tellingly so – the equivalent Medicare DSH

provision has no such required oversight of state charity-care programs.  See 42 U.S.C.

§ 1395ww(d)(5)(F)(vi).  This, of course, is because Congress, per Adena, never envisioned

reimbursement of such programs under the Medicare DSH adjustment.

Finally, federal approval of § 1115 expansion-waiver programs is not an act of agency

rubber-stamping: the agency has both approved and denied § 1115 expansion-waiver programs

on a state-by-state basis, and it has both included and excluded such patient days in the Medicare

DSH calculation on a hospital-by-hospital basis.  As to the former, courts have vacated § 1115

waiver projects where they have found that the agency could not rationally have determined that

such a program advanced the objectives of Medicaid.  See, e.g., Newton-Nations v. Betlach, 660

F.3d 370, 381-82 (9th Cir. 2011) (finding Secretary's approval of Arizona § 1115 waiver

program arbitrary and capricious by "entirely fail[ing] to consider" whether proposed program

promoted objectives of Medicaid).  As to the latter, the Secretary's inclusion of § 1115

expansion-waiver patient days in the Medicare DSH calculation is not a one-way ratchet.

What's good for the goose is good for the gander, as HHS has also denied such inclusion on

numerous occasions, denials which courts in both this Circuit and others have upheld.  See, e.g.,

Rogue Valley Med. Ctr. v. Sebelius, 410 Fed. App'x 344, 346 (D.C. Cir. 2010), Cookeville, 531

F.3d 844; Adventist Health Sys./Sunbelt, Inc. v. Sebelius, 715 F.3d 157, 164-65 (6th Cir. 2013).

These decisions strongly suggest that HHS exercises its discretion with care in determining when

to approve expansion-waiver programs and when to count such patient days in the Medicare

DSH-reimbursement process.  For such case-by-case, fact-based determinations, "courts appropriately defer to the agency entrusted by Congress to make such policy determinations." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991).

While Plaintiff may not like being on the wrong side of that congressional line-drawing exercise, there is no doubt that the Congress granted the agency discretion to include or exclude expansion-waiver patient days in the Medicare DSH calculation, and HHS has provided legitimate governmental purposes for the disparate treatment that may result.

2. *APA Challenge*

Turning now to Plaintiff's APA challenge, the Court is skeptical that such a claim is even cognizable in light of Adena and Cookeville.  Those two cases, after all, combine to stand for the proposition that Congress both expressly prohibits HHS from including charity-care patient days in the Medicare DSH reimbursement and expressly permits HHS to include expansion-waiver days in that calculation.  If so, then the disparate treatment results from a statutory classification, so Cooper's APA challenge is effectively a blanket objection to the fact that the Secretary has chosen to exercise the discretion Congress granted her to include expansion-waiver patient days in the Medicare DSH calculation.  Indeed, Cooper does not object to a particular expansion-waiver hospital's patient days that were included, but instead contends that the Secretary's disparate treatment of its charity-care patients and any expansion-waiver patients "is not based on a principled, justifiable classification."  Pl. MSJ at 30.  But given Adena, all Plaintiff's APA challenge can amount to is an objection to the Secretary's inclusion of expansion-waiver patient days at all.  In such a circumstance, the Court is doubtful whether Plaintiff even makes out a viable APA challenge in the first place.  Even if Cooper does somehow have a cognizable claim,

the Court is satisfied that the record supports HHS's determination to include § 1115 expansion-waiver patient days in the Medicare DSH calculation.

The Court will assess HHS's decision under the APA arbitrary-and-capricious standard to determine if it "is rational and supported by the record."  Oceana, Inc., 670 F.3d at 1240 (citation and internal quotation marks omitted).  Unlike the constitutional rational-basis standard, the Court here is restricted to the administrative record.  It then examines Plaintiff's latent argument that HHS inadequately responded to comments during the notice-and-comment rulemaking process.

a.  Evidence in the Record

In assessing the record, the Court begins by looking to HHS's 2000 statement in the Federal Register announcing the interim rule permitting Medicare DSH reimbursement for all § 1115 demonstration-project patient days, including expansion-waiver patient days.  That rule provided several reasons for their inclusion.  First, it noted that a key purpose of § 1115 was to extend Medicaid matching payments "to services furnished to populations that otherwise could not have been made eligible for Medicaid," with costs associated with these patients matched based on § 1115 authority.  See 65 Fed. Reg. at 3,137.  In particular, the interim rule pointed to the fact that, under the statute, costs of expansion waivers, "which would not otherwise be included as expenditures under [Medicaid,] . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures . . . approved under the State [Medicaid] plan . . . ." Id. (citing 42 U.S.C. § 1315(a)(2)(A)).  The agency determined that "includ[ing] the section 1115 expanded waiver population in the Medicare DSH calculation is fully consistent with the Congressional goals of the Medicare DSH adjustment to recognize the higher costs to hospitals

of treating low income individuals covered under Medicaid." Id. Thus, the agency argued, "the statute allows for the expansion populations to be treated as Medicaid beneficiaries." Id.

Because "a dialogue is a two-way street [–] the opportunity to comment is meaningless unless the agency responds to significant points raised by the public," Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 (D.C. Cir. 1977) – HHS followed up with a response to submitted comments in its final rule on August 1, 2000. See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2001 Rate, 65 Fed. Reg. 47,054 (Aug. 1, 2000). In the final-rule announcement, HHS summarized the 11 public comments it had received in response to the interim rule, including several that argued that permitting § 1115 demonstration-project states to include expansion-patient days would provide those states with an "unfair advantage" over states without such expansion programs. Id. at 47,086-87. Several also advocated that charity-care patient days continue to be included in Medicare DSH-reimbursement calculations, id. at 47,086, a question that, as discussed above, is now foreclosed here due to Adena.

In response, HHS stated that agency staff "consulted extensively with Medicaid staff and have determined that section 1115 expansion waiver days are utilized by patients whose care is considered to be an approved expenditure under Title XIX." Id. at 47,087. While the agency acknowledged that this would "advantage States that have a section 1115 expansion waiver in place," it reiterated that under the Medicaid staff's determination, "these days are considered to be Title XIX days by Medicaid standards." Id. The agency also recognized the confusion arising from including charity-care patient days funded by states and local governments in the Medicaid DSH calculation, while excluding it from the Medicare DSH calculation. But it reiterated that such patients' care "is not covered or paid by any health insurance program," and

so "these patients are not Medicaid-eligible under the State plan and are not considered Title

XIX beneficiaries." Id.

HHS also provided additional comments in revising the rule in a notice issued on August

1, 2003. There, it reiterated its earlier finding that covering expansion-waiver patients was

consistent with the aims of the Medicare DSH – which was to cover the higher costs associated

with treating Medicaid patients – since, according to the Medicaid staff themselves, these

patients are considered Medicaid eligible. See Medicare Program; Changes to the Hospital

Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 45,346, 45,420

(Aug. 1, 2003). The agency expanded on this reasoning: "In allowing hospitals to include patient

days related to section 1115 expansion waiver populations, our intention was to include patient

days of section 1115 expansion waiver populations who receive benefits under the demonstration

project that are similar to those available to traditional Medicaid beneficiaries, including

inpatient benefits." Id. at 45,420-21.

On the basis of the record alone, then, the Court is satisfied that HHS provided a rational

basis to exercise its discretion to include § 1115 expansion-waiver patients as part of Medicare

DSH reimbursements. As the agency noted, the Medicaid staff consider § 1115 expansion-

waiver patients to be Medicaid patients, and treating them as such furthered the purpose of

§ 1115, which was to expand services to populations otherwise ineligible for treatment under

Medicaid. The agency reasonably distinguished these patients from charity-care patients, who

are not covered or paid by any health-insurance program, including Medicaid, and so their

treatment costs are not reimbursable by the federal program. The Court concludes, just as the

Third Circuit did in a similar challenge in Nazareth, that these distinct purposes "rationally

separate Section 1115 demonstration projects from" charity-care programs. See 747 F.3d at 183

34

(citation and internal quotation marks omitted).  The Secretary's decision was thus neither arbitrary nor capricious.

### b.   Adequate Response to Comments

Finally, although Plaintiff does not expressly argue that the Secretary's decision should be overturned due to an inadequate response to comments, it insinuates as much.  Cooper argues that HHS's response to comments did not "actually address[] the resulting disparity and inequity to hospitals treating non-Medicaid low-income patients . . . in non-Section 1115 waiver states" that commenters brought to light.  See Pl. MSJ at 29.  Given the subsequent holdings of Adena and Cookeville, it is doubtful whether the agency had any obligation to address a disparity created by Congress.  Yet, as discussed above, in 2000 HHS did provide a rational basis for the difference: it "consulted extensively with Medicaid staff," who considered expansion-waiver patients' care to be care under Medicaid.  See 65 Fed. Reg. at 47,087.  It acknowledged that "[w]hile this does advantage States that have a section 1115 expansion waiver in place, these days are considered to be [Medicaid] days by Medicaid standards."  Id.  In contrast, the agency noted, "Charity care days are those days that are utilized by patients . . . whose care is not covered or paid by any health insurance program," including Medicaid.  Id.  "While we recognize that these days may be included in the calculation of a State's Medicaid DSH payments, these patients are not Medicaid-eligible under the State plan and are not considered [Medicaid] beneficiaries."  Id.

As the D.C. Circuit has observed, while the agency must adequately explain its decision and respond to relevant and significant public comments, "neither requirement is particularly demanding."  Pub. Citizen, 988 F.2d at 197.  The Court concludes that the agency has satisfied this requirement.  In a nearly identical challenge, the Third Circuit in Nazareth found that the

agency's "'response demonstrates that the [agency] considered and rejected' the arguments of [plaintiffs], [and] 'this is all that the Administrative Procedure Act requires.'"  747 F.3d at 185 (quoting Covad Commc'ns Co. v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006)).  The Court concurs.

## IV.  Conclusion

In sum, given Adena's controlling holding that charity-care patients like Cooper's may not be included in the Medicare DSH calculation and Cookeville's determination that the Secretary possessed broad discretion in 2001 either to include or exclude § 1115 expansion-waiver patient days in that calculation, the Court holds that HHS has adequately provided a legitimate governmental basis for the disparate treatment of § 1115 expansion-waiver programs and state charity-care programs like the NJCCP to survive an equal-protection challenge. Because the line-drawing exercise was one done by Congress, the Court doubts that Plaintiff's APA challenge remains cognizable, but assuming *arguendo* that it is, the Court is also satisfied that the Secretary's decision to include expansion-waiver patient days in the Medicare DSH calculation is rational and supported by the record.  The Court will, consequently, grant Defendant's Motion for Summary Judgment on both counts.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 11, 2016